1  Stacey Geis, CA Bar No. 181444
   Earthjustice
2  50 California St., Suite 500
   San Francisco, CA  94111-4608
3  Phone: (415) 217-2000
   Fax: (415) 217-2040
4  sgeis@earthjustice.org
5
   *Local Counsel for Plaintiffs Sierra Club et al.*
6  *(Additional Counsel Listed on Signature Page)*
7

8              **UNITED STATES DISTRICT COURT**
          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
9

10  SIERRA CLUB; CENTER FOR                )
    BIOLOGICAL DIVERSITY;                  )
11  EARTHWORKS; ENVIRONMENTAL              )
    DEFENSE FUND; NATURAL                  )
12  RESOURCES DEFENSE COUNCIL; THE         )
    WILDERNESS SOCIETY; NATIONAL           )
13  WILDLIFE FEDERATION; CITIZENS          )
    FOR A HEALTHY COMMUNITY; DINÉ          )
14  CITIZENS AGAINST RUINING OUR           )
    ENVIRONMENT; ENVIRONMENTAL             )
15  LAW AND POLICY CENTER; FORT            )  Case No. _____
16  BERTHOLD PROTECTORS OF WATER           )
    AND EARTH RIGHTS; MONTANA              )
17  ENVIRONMENTAL INFORMATION              )
    CENTER; SAN JUAN CITIZENS              )  **COMPLAINT FOR DECLARATORY**
18  ALLIANCE; WESTERN ORGANIZATION         )  **AND INJUNCTIVE RELIEF**
19  OF RESOURCE COUNCILS;                  )
    WILDERNESS WORKSHOP;                   )  (Administrative Procedure Act,
20  WILDEARTH GUARDIANS; and               )  5 U.S.C. § 551, *et seq.*)
21  WYOMING OUTDOOR COUNCIL,               )
                                           )
22        Plaintiffs,                      )
                                           )
23        v.                               )
                                           )
24  RYAN ZINKE, in his official capacity as )
25  Secretary of the Interior; BUREAU OF   )
    LAND MANAGEMENT; and UNITED            )
26  STATES DEPARTMENT OF THE               )
    INTERIOR,                              )
27                                         )
28        Defendants.                      )

**INTRODUCTION**

1.     This case challenges the U.S. Bureau of Land Management's (BLM) final decision, 82 Fed. Reg. 58,050 (Dec. 8, 2017) (Amendment), to amend the compliance deadlines for the majority of the requirements of its Waste Prevention, Production Subject to Royalties, and Resource Conservation Rule (Waste Prevention Rule or Rule).  81 Fed. Reg. 83,008 (Nov. 18, 2016).  The Amendment unlawfully pushes the compliance deadlines one year into the future while BLM considers other changes to the Waste Prevention Rule.

2.     The Waste Prevention Rule sets standards to limit the pervasive problem of waste of natural gas by oil and gas companies operating on federal or tribal oil and gas leases.  These companies waste publicly-owned gas by deliberately venting it into the atmosphere, flaring it (burning it without capturing the energy), or otherwise allowing it to leak into the air.  The Rule requires operators to control this waste and bring more gas to market using proven, widely-available technologies that are already required in some states and used by leading companies.

3.     BLM adopted the Waste Prevention Rule in response to numerous federal studies and its own findings showing that waste of publicly and tribally owned natural gas is a problem that must be addressed.  BLM determined that its existing waste regulation, Notice to Lessees and Operators of Onshore Federal and Indian Oil and Gas Leases (NTL-4A), 44 Fed. Reg. 76,600 (Dec. 27, 1979)—which had not been updated in more than 35 years—was outdated and inadequate.

4.     The Waste Prevention Rule has many benefits beyond controlling waste:  it increases revenues for states, local governments, tribes, and individual Indian mineral owners that receive royalties paid on oil and gas production, and reduces air pollution, including greenhouse gas emissions and other smog-forming and hazardous air pollutants.

5.     In response to direction from President Trump, BLM has announced its intention to reverse course and revise or rescind the Waste Prevention Rule.  Although BLM has yet to issue a proposal to revise or rescind the Rule (beyond amending its compliance dates), it has twice attempted to put off those compliance deadlines while it more broadly reconsiders the Rule.  On June 15, 2017, without providing notice or an opportunity for public comment, BLM announced that it was indefinitely staying all of the Rule's provisions with future compliance dates, pursuant to

purported authority under 5 U.S.C. § 705.  82 Fed. Reg. 27,430 (June 15, 2017).  The Conservation and Tribal Citizen Groups and the States of California and New Mexico filed suit over that action in this Court.  This Court granted plaintiffs' motions for summary judgment, declared that BLM's purported attempt to stay the Rule's compliance dates violated the APA, vacated the stay, and ordered BLM to reinstate the Rule in its entirety.  *California v. BLM*, Nos. 17-cv-3804-EDL & 17-cv-3885-EDL, 2017 WL 4416409, at *14 (Oct. 4, 2017).

6.     The very next day, BLM published a proposal to suspend or delay compliance with the same requirements that the Court had just ordered BLM to reinstate, plus additional requirements, for a year, and opened a 30-day public comment period.  82 Fed. Reg. 46,458 (Oct. 5, 2017).  BLM explained that its proposed suspension was based on its desire to avoid imposing compliance costs on operators while the agency reconsiders the Rule.  On December 8th, 2017, BLM took final action, amending the compliance dates for the Rule's most significant provisions by delaying them for a year, until January 17, 2019 (the Amendment).

7.     In the Amendment, BLM neither analyzes nor offers interim rules or guidance to satisfy its statutory responsibility to prevent waste.  The Amendment does not even reinstate BLM's prior, outdated waste regulation, NTL-4A.  Instead, BLM's action creates a regulatory and policy vacuum that BLM concedes will decrease the amount of natural gas brought to market by nine billion cubic feet (bcf).  This will result in a reduction in royalties and will have harmful impacts on public health and the environment by increasing emissions of methane—a potent greenhouse gas—and other air pollutants.

8.     The Conservation and Tribal Citizen groups challenge the Amendment's unlawful modification of the Waste Prevention Rule based on violations of the Mineral Leasing Act (MLA), 30 U.S.C. §§ 187, 225, the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701(a)(8), 1702(c), 1732(b), the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(C); and the Administrative Procedure Act (APA), 5 U.S.C. §§ 553, 706(2)(A), (C).

9.     The Conservation and Tribal Citizen Groups respectfully seek a declaration that BLM's Amendment violates the MLA, FLPMA, NEPA, and the APA, and is arbitrary, capricious, contrary to law, and in excess of authority within the meaning of 5 U.S.C. §§ 706(2)(A), (C).  The

1    Conservation and Tribal Citizen Groups also seek an order vacating the Amendment and

2    immediately reinstating all provisions of the Waste Prevention Rule.

3                            **JURISDICTION AND VENUE**

4         10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question

5    jurisdiction) and 5 U.S.C. § 702 (the APA).

6         11.     An actual controversy exists between the parties within the meaning of 28 U.S.C.

7    § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to

8    28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705–706.

9         12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant BLM

10   maintains offices in this district.  BLM administers 15 million acres of public lands, more than 49

11   million acres of subsurface mineral estate, and nearly 600,000 acres of Native American tribal

12   mineral estate in California.  At the end of fiscal year 2016, BLM administered 530 oil and gas

13   leases in California, covering around 200,000 acres and containing around 6,800 oil and gas wells.

14   BLM specifically manages public oil and gas resources in this district that are subject to the Waste

15   Prevention Rule.  In 2016, California operators developed more than 11 million barrels of federal oil

16   and 12 bcf of federal natural gas, and flared more than 0.4 bcf of federal natural gas.

17        13.     Venue is further proper in this district because Plaintiffs Sierra Club and Center for

18   Biological Diversity are nonprofit corporations in good standing incorporated in the State of

19   California.  Plaintiff Sierra Club is headquartered in Oakland, and Center for Biological Diversity

20   and Earthworks have offices in Oakland.  Additionally, Plaintiffs Environmental Defense Fund,

21   Natural Resources Defense Council, and The Wilderness Society maintain offices in this district.

22   The Conservation and Tribal Citizen Groups collectively have more than half a million members

23   living in California.  This includes more than 160,000 members residing in the Northern District.

24                           **INTRADISTRICT ASSIGNMENT**

25        14.     Pursuant to Civil Local Rules 3-5(b) and 3-2(c), there is no basis for assignment of

26   this action to any particular location or division of this Court.  However, this case is related to Case

27   No. 3:17-cv-07186, which is currently pending in the San Francisco Division.  Case No. 3:17-cv-

28   07186, filed by the States of California and New Mexico, also challenges the Amendment.  The legal

1  claims in that case are nearly identical to the legal claims in this case.  Pursuant to Civil Local Rule
2  3-12(b), Plaintiffs intend to promptly file an Administrative Motion to Consider Whether Cases
3  Should Be Related.
4  **PARTIES**
5    15.    Plaintiff SIERRA CLUB, founded in 1892, is the nation's oldest and largest
6  grassroots environmental organization.  Sierra Club is incorporated and headquartered in California,
7  with a principal place of business at 2101 Webster St., Suite 1300, Oakland, CA 94612.  Sierra Club
8  has about 250 employees who work in California, including about 200 employees who work at its
9  headquarters in Oakland.  Sierra Club California has thirteen local chapters, including five chapters
10  in northern California that collectively have about 96,600 members:  the Loma Prieta, Mother Lode,
11  Redwood, San Francisco Bay, and Ventana Chapters.  Sierra Club currently has more than 830,000
12  members nationwide, including more than 182,000 in California.  More than 71,000 of these
13  members reside in the Northern District of California.  Sierra Club's mission is to explore, enjoy,
14  and protect the wild places of the earth; to practice and promote the responsible use of the earth's
15  ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the
16  natural and human environment; and to use all lawful means to carry out these objectives.  In
17  addition to helping people from all backgrounds explore nature and our outdoor heritage, Sierra Club
18  works to promote clean energy, safeguard the health of our communities, protect wildlife, and
19  preserve our remaining wild places through grassroots activism, public education, lobbying, and
20  legal action.  Sierra Club pursues these objectives nationwide, including in California.  For example,
21  Sierra Club has been actively involved in raising awareness about the public health consequences of
22  oil and gas activities on public lands, including in northern California.  Sierra Club sued BLM for
23  failing to consider the impacts of hydraulic fracturing before leasing public lands in Monterey
24  County for oil and gas development.  *Ctr. for Biological Diversity v. BLM*, 937 F. Supp. 2d 1140
25  (N.D. Cal. 2013).  In April 2017, Sierra Club submitted comments on BLM's Draft Resource
26  Management Plan Amendment/Environmental Impact Statement for oil and gas leasing and
27  development within the Central Coast Field Office.  The Central Coast Field Office includes all or
28

1   part of several counties within the Northern District of California:  Alameda, Contra Costa,

2   Monterey, San Benito, San Francisco, San Mateo, Santa Clara, and Santa Cruz.

3          16.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a nonprofit

4   organization incorporated in the State of California that works through science, law, and policy to

5   secure a future for all species, great or small, hovering on the brink of extinction.  The Center has

6   offices throughout the country, including an office in Oakland, California.  The Center has over

7   58,500 members, including more than 13,000 in California, and more than 1.3 million online

8   supporters worldwide.  Specifically, the Center has more than 4,000 members residing in the

9   Northern District of California.  The Center's members use BLM-managed public lands for

10  recreational, scientific, educational, and other pursuits and intend to continue to do so in the future,

11  and are particularly interested in protecting the many native, imperiled, and sensitive species and

12  their habitats that may be affected by oil and gas leasing.  Although the Center pursues its objectives

13  of protecting threatened and endangered species and their habitats nationwide, the Center

14  specifically works to protect public lands administered by BLM in the Northern District of

15  California from the harmful impacts of oil and gas development, including methane emissions.  The

16  Center researches, documents, and raises awareness of the environmental consequences of oil and

17  gas development and hydraulic fracturing in California.  This campaign includes, among other

18  efforts, publishing reports on aquifer contamination and seismic risks from oil and gas activities,

19  rallying local governments, including Monterey County, to prohibit hydraulic fracturing, and

20  litigating BLM's oil and gas leasing activities on California public lands.  Like Sierra Club, the

21  Center was a plaintiff in a 2011 lawsuit challenging BLM's failure to consider the impacts of

22  hydraulic fracturing in the Northern District of California.  *Ctr. for Biological Diversity v. BLM*, 937

23  F. Supp. 2d 1140 (N.D. Cal. 2013).

24         17.    Plaintiff EARTHWORKS is a membership-based 501(c)(3) nonprofit organization

25  dedicated to protecting communities and the environment from the adverse impacts of mineral and

26  energy development while promoting sustainable solutions.  Earthworks was created in 2005, when

27  two organizations (the Mineral Policy Center and the Oil & Gas Accountability Project) joined

28  forces.  Earthworks collaborates with communities and grassroots groups to reform government

1  policies to better protect air, water, public lands and communities from threats posed by mineral

2  development.  Earthworks has an office in California.  Earthworks has more than 70,000 members

3  nationwide, including over 9,200 members in California.  Among Earthworks' members,

4  approximately 4,200 live in the Northern District of California.

5       18.   Plaintiff ENVIRONMENTAL DEFENSE FUND (EDF) is a national nonprofit

6  organization representing over 420,000 members nationwide, including over 70,000 in California.

7  Over 25,000 of these members reside in the Northern District of California.  Since 1967, EDF has

8  linked science, economics, and law to create innovative, equitable, and cost-effective solutions to

9  urgent environmental problems.  EDF employs more than 150 scientists, economists, engineers,

10  business school graduates, and lawyers to help solve challenging environmental problems in a

11  scientifically sound and cost-effective way.  These staff work throughout the nation, including in two

12  California offices, one in San Francisco, and one in Sacramento.  More than 100 EDF staff members

13  live and work in California.  EDF pursues initiatives at the state and national levels designed to

14  protect human health and the environment.  Among these initiatives, EDF has worked to reduce

15  waste from oil and gas operations on public lands along with its associated health-harming and

16  climate-altering air pollution.

17       19.   Plaintiff NATURAL RESOURCES DEFENSE COUNCIL (NRDC) is a non-profit

18  environmental membership organization that uses law, science, and the support of more than

19  408,000 members throughout the United States, including nearly 80,000 in California, to protect

20  wildlife and wild places and to ensure a safe and healthy environment for all living things.  More

21  than 33,000 NRDC's members reside in the Northern District of California.  NRDC has offices

22  throughout the country, including offices in San Francisco and Santa Monica, California.  NRDC has

23  a long-established history of working to protect public lands and clean air.  In particular, NRDC has

24  worked for decades to protect public lands, nearby communities, wildlife habitat and air quality from

25  the threats posed by oil and gas development.

26       20.   Plaintiff THE WILDERNESS SOCIETY (TWS) has a mission to protect wilderness

27  and inspire Americans to care for our wild places.  TWS has offices throughout the country,

28  including offices in San Francisco and Pasadena, California, and a California Desert representative.

1   TWS has more than 1,000,000 members and supporters around the West, including more than

2   91,000 in California.  TWS has a long-standing interest in the management of public lands across the

3   nation, and engages frequently in land use planning and project proposals that could potentially

4   affect wilderness quality lands, wildlife habitat, and other natural resources, as well as the health,

5   safety and quality of life of surrounding communities.  TWS also has a long-standing interest in the

6   use of our public and tribal lands for energy development, including supporting a transition to

7   renewable energy, and ensuring that oil and gas and other energy development are focused in

8   suitable locations and completed in a manner that does not harm other values.  TWS has been

9   actively involved in planning, policy, and conservation efforts in California, including the Northwest

10  California Integrated Resource Management Plan for BLM lands in Humboldt, Mendocino, Del

11  Norte, Trinity, Shasta, Siskiyou, Butte, and Tehama Counties.  TWS also focuses on protecting the

12  Cascade-Siskiyou National Monument, the San Gabriel Mountains, Sierra Nevada, the California

13  Desert, and the Central Coast.

14       21.    Plaintiff NATIONAL WILDLIFE FEDERATION (NWF), founded in 1936, is one of

15  the nation's premier grassroots non-profit conservation advocacy and education organizations.  The

16  group is America's largest conservation organization with a mission to ensure that wildlife thrive in

17  a rapidly-changing world.  Headquartered in Reston, Virginia, NWF has offices throughout the

18  country, including an office in California.  NWF has more than six million members and supporters

19  and has affiliate organizations in 51 states and territories, including more than 57,000 members and

20  3,500 affiliate members in California.  More than 25,000 of NWF's members reside in the Northern

21  District of California.  NWF has a strong history of protecting public lands for wildlife and outdoor

22  recreation by its members and is known among conservation groups for its ability to combine strong

23  science, federal and state policy development, education, litigation, and grassroots organizing.

24       22.    Plaintiff CITIZENS FOR A HEALTHY COMMUNITY (CHC) is a grass-roots

25  organization with more than 500 members formed in 2009 for the purpose of protecting people and

26  their environment from the impacts of BLM-authorized oil and gas development in the Delta County

27  region of Colorado.  CHC's members and supporters include organic farmers, ranchers, vineyard and

28  winery owners, sportsmen, realtors, and other concerned citizens impacted by oil and gas

development.  CHC members have been actively involved in commenting on BLM's oil and gas activities.

23.     Plaintiff DINÉ CITIZENS AGAINST RUINING OUR ENVIRONMENT (Diné C.A.R.E.) is an all-Navajo organization comprised of a federation of grassroots community activists in Arizona, New Mexico and Utah who strive to educate and advocate for traditional teachings derived from Diné Fundamental Laws.  Diné C.A.R.E.'s goal is to protect all life in their ancestral homeland by empowering local and traditional people to organize, speak out, and determine the outlook of the environment through civic involvement and engagement in decision-making processes relating to tribal development, including oil and gas development on public and tribal lands in the San Juan Basin of New Mexico.

24.     Plaintiff ENVIRONMENTAL LAW AND POLICY CENTER (ELPC) is a Midwest based not-for-profit corporation and legal advocacy organization concerned with improving environmental quality and protecting natural resources in the Midwest and Great Plains states. ELPC works on a variety of issues throughout the Midwest and Great Plains states, including advocating for clean air, clean water, renewable energy, sustainable transportation, and protecting natural places.  ELPC's work includes efforts to minimize negative environmental impacts from oil and gas development.  ELPC has members in North Dakota whose recreational and aesthetic interests are impacted by the wasteful and polluting practices of venting and flaring natural gas from oil wells.

25.     Plaintiff FORT BERTHOLD PROTECTORS OF WATER AND EARTH RIGHTS (Fort Berthold POWER) is a grassroots, member-led community group that works to promote responsible energy development in and around Fort Berthold Indian Reservation in North Dakota. Fort Berthold POWER is committed to working toward a sustainable society with an awareness for all life.  The mission of Fort Berthold POWER is to conserve and protect the land, water, and air on which all life depends.  Fort Berthold POWER works to engage citizens in activities that protect the environment, facilitates learning for members to disseminate information on environmental issues that affect all people, and expands members' ability to take effective action to address issues that affect land, air, and water.

Complaint for Declaratory and Injunctive Relief                                                    9

26.     Plaintiff MONTANA ENVIRONMENTAL INFORMATION CENTER (MEIC) is a nonprofit organization founded in 1973 with approximately 5,000 members and supporters throughout the United States, including in California.  MEIC is dedicated to the preservation and enhancement of the natural resources and natural environment of Montana and to the gathering and disseminating of information concerning the protection and preservation of the human environment through education of its members and the general public concerning their rights and obligations under local, state, and federal environmental protection laws and regulations.  MEIC is also dedicated to assuring that federal officials comply with and fully uphold the laws of the United States that are designed to protect the environment from pollution.

27.     Plaintiff SAN JUAN CITIZENS ALLIANCE (SJCA), founded in 1986, organizes people to protect our water and air, our lands, and the character of our rural communities in the San Juan Basin.  SJCA focuses on four program areas, one of which is the San Juan Basin Energy Reform Campaign, which seeks to ensure proper regulation and enforcement of the oil, gas, and coal industry and facilitate a transition to a renewable energy economy.  SJCA has been active in BLM oil and gas issues in the San Juan Basin since the early 1990s.  SJCA has 800 members.

28.     Plaintiff WESTERN ORGANIZATION OF RESOURCE COUNCILS (WORC) is a nonprofit organization that works to advance the vision of a democratic, sustainable, and just society through community action.  WORC is committed to building sustainable environmental and economic communities that balance economic growth with the health of people and stewardship of their land, water, and air resources.  WORC is a network of grassroots organizations from seven states that includes over 12,000 members and 39 local community group chapters.  WORC's members are family farmers and ranchers, townspeople, and rural residents concerned about their communities and environment.  WORC's current goals include organizing and educating landowners, residents, mineral estate owners and water users about the impacts of oil and gas exploration and development and ensuring that the BLM enforces all applicable laws and regulations related to oil and gas leasing and development.

29.     Plaintiff WILDERNESS WORKSHOP is a nonprofit organization based in Carbondale, Colorado that is dedicated to preservation and conservation of the wilderness and

natural resources of the White River National Forest and adjacent public lands.  Wilderness Workshop engages in research, education, legal advocacy and grassroots organizing to protect the ecological integrity of local landscapes and public lands.  Wilderness Workshop focuses on the monitoring and conservation of air and water quality, wildlife species and habitat, natural communities and lands of wilderness quality.  Wilderness Workshop was founded in 1967 and has approximately 800 members.

30.     Plaintiff WILDEARTH GUARDIANS (Guardians) is a non-profit conservation organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West.  Guardians has offices in Colorado, Montana, New Mexico, Arizona, Washington, and Oregon. With more than 120,000 members and supporters, Guardians works to sustain a transition from fossil fuels to clean energy in order to safeguard the West.

31.     Plaintiff WYOMING OUTDOOR COUNCIL (WOC) was founded in 1967.  It is Wyoming's oldest independent conservation organization.  WOC works to protect Wyoming's environment and quality of life for future generations.  Its goal is to develop productive and lasting solutions for managing natural resources through collaborative engagement with stakeholders and decision makers.  WOC believes responsible environmental stewardship is fundamental to safeguarding public health and Wyoming's quality of life.  WOC's nearly 2,000 members recognize that Wyoming's landscapes, wildlife, and diverse cultural history are vital resources, and that everyone relies on the state's clean air and water.

32.     The Conservation and Tribal Citizen Groups bring this action on behalf of themselves and their adversely affected members.  For many years, the Conservation and Tribal Citizen Groups have actively advocated for strong BLM standards for the reduction of waste and associated air pollution from federal and tribal leases, and have devoted significant resources toward that effort. For example, the Conservation and Tribal Citizen Groups and their members submitted scoping comments and comments on the proposed Waste Prevention Rule and participated in public meetings and hearings.  The Conservation and Tribal Citizen Groups also have intervened to defend the Waste Prevention Rule from a lawsuit filed by several states and industry groups.  Further, the Conservation and Tribal Citizen Groups' staff and members helped to successfully oppose an

1  attempt to persuade Congress to repeal the Rule using the Congressional Review Act.  Moreover, the

2  Conservation and Tribal Citizen Groups successfully sued BLM when it unlawfully attempted to

3  stay the Waste Prevention Rule's compliance dates.  *California v. BLM*, Nos. 17-cv-3804-EDL &

4  17-cv-3885-EDL, 2017 WL 4416409, at *14 (Oct. 4, 2017).  Finally, the Conservation and Tribal

5  Citizen Groups and their members submitted comments on BLM's proposed Amendment.

6      33.    Many Conservation and Tribal Citizen Group members live in communities that

7  receive income from royalties from oil and gas development on public and tribal lands that is used to

8  fund schools, healthcare, and infrastructure.  Other Conservation and Tribal Citizen Group members

9  are partial royalty owners of tribal leases.  The Amendment will lead to reductions in these royalty

10  payments.

11      34.    Numerous Conservation and Tribal Citizen Group members live, work, and recreate

12  in and around, and otherwise use and enjoy, lands where oil and gas development is occurring or has

13  been proposed on federal and tribal leases and are therefore likely to be affected by the associated air

14  pollution and other impacts from such development.  For example, some members live on or near

15  split estate lands (where the federal government owns the minerals underlying their property) that

16  are already subject to oil and gas development or are likely to be developed in the future.  Other

17  members use public lands in and around federal and tribal leases for recreation, solitude, and

18  scientific study.  These members will be adversely affected by the Amendment.  As a result of BLM

19  modifying the compliance deadlines in the Waste Prevention Rule, operators will be permitted to

20  release more air pollution and flare more gas—which causes bright, incandescent fires at flare stacks

21  and excessive noise—than if the Rule remained in effect.  This harms the Conservation and Tribal

22  Citizen Groups' members by disrupting their daily lives, subjecting them to adverse health risks, and

23  reducing their enjoyment of the public, split estate, and tribal lands where they live and recreate.

24      35.    Defendant RYAN ZINKE is the Secretary of the Interior.  The Conservation and

25  Tribal Citizen Groups sue Secretary Zinke in his official capacity.  Secretary Zinke oversees the

26  development of energy, including natural resource extraction, on federal and tribal leases.  Secretary

27  Zinke is ultimately responsible for BLM's Amendment.

28

1    36.    Defendant BUREAU OF LAND MANAGEMENT is an agency of the United States

2    within the Department of the Interior.  BLM is responsible for managing publicly-owned lands and

3    minerals, in accordance with federal law.  BLM promulgated the Waste Prevention Rule, and later

4    promulgated the Amendment.

5    37.    Defendant U.S. DEPARTMENT OF THE INTERIOR is an executive branch

6    department that oversees BLM, and is thus ultimately responsible for BLM's Amendment.

7                                        **LEGAL FRAMEWORK**

8    **I.    Mineral Leasing Act and Indian Mineral Leasing Act**

9    38.    Under the MLA, the Secretary of the Interior must ensure that when oil and gas

10   companies are permitted to develop publicly-owned natural resources, they "use all reasonable

11   precautions to prevent waste of oil or gas."  30 U.S.C. § 225.

12   39.    The MLA also requires that leases include provisions to ensure "the exercise of

13   reasonable diligence, skill, and care in the operation of said property," that "such rules . . . for the

14   prevention of waste as may be prescribed by [the] Secretary shall be observed," and such other

15   provisions as are necessary "for the protection of the interests of the United States," and for "the

16   safeguarding of the public welfare."  *Id.* § 187.

17   40.    The Secretary of the Interior also is "authorized to prescribe necessary and proper

18   rules and regulations and to do any and all things necessary to carry out and accomplish the purposes

19   of [the MLA]."  30 U.S.C. § 189.

20   41.    BLM regulates tribal minerals pursuant to the Indian Mineral Leasing Act (IMLA),

21   which provides that "[a]ll operations under any oil, gas, or other mineral lease" issued pursuant to

22   the IMLA or other related statutes "shall be subject to the rules and regulations promulgated by the

23   Secretary of the Interior."  25 U.S.C. § 396d.

24   **II.    Federal Land Policy and Management Act**

25   42.    FLPMA directs BLM to manage the public lands "in a manner that will protect the

26   quality of the . . . scenic . . . environmental, [and] air and atmospheric . . . values."  43 U.S.C.

27   § 1701(a)(8).

28

43.     FLPMA further provides that BLM "shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the [public] lands." *Id.* § 1732(b).

44.     FLPMA requires that "[t]he Secretary shall manage the public lands under the principles of multiple use and sustained yield." *Id.* § 1732(a). "Multiple use" is defined as "management of the public lands . . . that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation . . . minerals . . . and natural, scenic, scientific, and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily the combination of uses that will give the greatest economic return or the greatest unit output." *Id.* § 1702(c).

## III.    National Environmental Policy Act

45.     Prior to undertaking any "major Federal action[] significantly affecting the quality of the human environment," NEPA requires federal agencies to provide a "detailed statement" explaining "the environmental impact of the proposed action . . . alternatives to the proposed action, . . . and any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C)(i), (iii), (v). Agencies must "integrate the NEPA process with other planning at the earliest possible time." 40 C.F.R. § 1501.2.

46.     NEPA analyses are intended "to foster excellent action" and "to help public officials make decisions that are based on [an] understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." *Id.*

47.     To determine if preparing an environmental impact statement (EIS) is necessary, Council on Environmental Quality (CEQ) regulations implementing NEPA allow agencies to prepare an environmental assessment (EA) with "sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9. Department of the Interior regulations include a similar requirement. *See* 43 C.F.R. § 46.300.

48.     Relevant factors in determining whether an EIS is necessary include "consideration of both context and intensity."  40 C.F.R. § 1508.27.  Factors relevant to "intensity" include "[t]he degree to which the proposed action affects public health or safety," "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," and "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts."  *Id.* § 1508.27(b)(2), (4), (7).

49.     Regardless of whether agencies choose to prepare an EIS or EA, they must "[r]igorously explore and objectively evaluate all reasonable alternatives."  *Id.* § 1502.14(a).  In mandating the comparative analysis of reasonable alternatives, agencies are able to "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public."  *Id.* § 1502.14.  CEQ regulations implementing NEPA identify the alternatives analysis as the "heart" of a NEPA document.  *Id.* § 1502.14.

50.     An EIS or EA must take a hard look at the direct, indirect, and cumulative impacts of each reasonable alternative.  *Id.* §§ 1502.16(a), (b), 1508.7, 1508.8, 1508.25(c).  Direct impacts are those impacts "caused by the action and [that] occur at the same time and place."  *Id.* § 1508.8.  Indirect impacts are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  *Id.*  Cumulative impacts are "the impact[s] on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  *Id.* § 1508.7.

51.     "Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements."  *Id.* § 1502.24.  An agency's environmental analysis must be based on "high quality" information, "[a]ccurate scientific analysis," and "expert agency comments."  *Id.* § 1500.1(b).

## IV.    Administrative Procedure Act

52.     The APA requires agencies to provide the public with notice before they adopt, amend, or repeal a regulation.  5 U.S.C. § 553(b).  The notice shall include "reference to the legal

1   authority under which the rule is proposed; and either the terms or substance of the proposed rule."

2   *Id*.  Agencies must also solicit comments, "giv[ing] interested persons an opportunity to participate

3   in the rule making through submission of written data, views, or arguments."  *Id.* § 553(c).  After

4   consideration of the comments, "the agency shall incorporate in the rules adopted a concise general

5   statement of their basis and purpose."  *Id*.

6       53.    The APA also authorizes judicial review of agency actions and provides that courts

7   "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary,

8   capricious, an abuse of discretion, or otherwise not in accordance with law . . . in excess of statutory

9   jurisdiction, authority, or limitations, or short of statutory right; . . . [or] without observance of

10  procedure required by law."  *Id.* § 706(2)(A), (C), (D).

11      54.    As a component of judicial review, "to prevent irreparable injury, the reviewing court

12  . . . may issue all necessary and appropriate process to postpone the effective date of an agency

13  action or to preserve status or rights pending conclusion of the review proceedings."  *Id.* § 705.

## FACTUAL BACKGROUND

### I.    BLM Develops the Waste Prevention Rule

16      55.    BLM adopted the Waste Prevention Rule pursuant to its authority under the MLA,

17  FLPMA, and other statutes to address wasteful venting, flaring, and leaking of natural gas from oil

18  and gas leases developing federal or tribal minerals.

19      56.    BLM has long regulated venting and flaring of publicly owned natural gas produced

20  from federal leases, and determined when operators must pay the federal government royalties for

21  wasted gas.  *See* Notice To Lessees and Operators of Onshore Federal and Indian Oil and Gas Leases

22  (NTL-4A), 44 Fed. Reg. 76,600 (Dec. 27, 1979).  When BLM promulgated the Waste Prevention

23  Rule in 2016, it replaced NTL-4A.  This was the first update of its standards for venting and flaring

24  publicly-owned natural gas since NTL-4A was issued in 1979.  BLM determined that it was

25  necessary to update NTL-4A because it did not reflect modern technologies and practices, was

26  subject to inconsistent application, and was not effective in minimizing waste and lost royalties.

27      57.    BLM also adopted the Rule in response to recommendations from several oversight

28  reviews, including reviews by the Office of the Inspector General of the Department of the Interior

and the Government Accountability Office (GAO).  An October 2010 report by the GAO raised concerns about waste of public resources and the inadequacies of BLM's existing requirements.  The GAO specifically recommended that BLM update its regulations to take advantage of opportunities to capture additional recoverable natural gas using available technologies.

58.    BLM estimates that federal oil and gas lessees vented or flared more than 462 bcf of natural gas on public and tribal lands between 2009 and 2015.  This figure does not include natural gas that leaked from various pieces of drilling, storage, and processing equipment.  As a result of this waste, states, tribes, and federal taxpayers lost millions of dollars annually in royalty revenues.  These revenues otherwise would have been available to fund schools, health care, and infrastructure.

59.    In 2014 BLM commenced the rulemaking process for the Waste Prevention Rule.  BLM solicited extensive stakeholder feedback through public forums held in communities across the country.  BLM issued a proposed rule, incorporating this feedback, in early 2016.  BLM again held public hearings, as well as tribal outreach sessions, at locations around the country.  The agency received more than 330,000 public comments.  BLM finalized the Waste Prevention Rule on November 18, 2016.  The Rule's effective date was January 17, 2017.

60.    BLM determined that the Rule's requirements were reasonable and cost-effective measures to minimize waste.  The Rule requires operators to capture and sell natural gas that would otherwise be vented or flared by establishing a phased-in capture target that tightens from 85% in January 2018 to 98% by 2026.  The Rule also sets specific performance standards to reduce waste from some types of equipment, including storage tanks and pneumatic controllers.  The Rule further requires operators to periodically inspect their facilities for leaks, and to promptly repair any leaks identified.  The Rule includes exemptions if compliance would cause operators to abandon development of significant oil or gas resources.

61.    Operators were required to comply with some of the Rule's requirements, such as the requirement to submit unenforceable waste minimization plans with applications for permits to drill, starting on January 17, 2017.  For other requirements provisions, BLM set an initial compliance deadline of January 17, 2018, one year after the Rule's effective date.

62.     BLM estimates that the Rule would reduce wasteful venting and methane emissions by 35% and wasteful flaring by 49%.  BLM also estimates that the Rule would increase royalties by up to $14 million per year.

63.     BLM also found that the Rule would significantly benefit local communities, public health, and the environment.  For example, BLM found that the Rule would reduce the visual and noise impacts associated with flaring.  BLM further found that the Rule would protect communities from smog and carcinogenic air toxic emissions, and reduce greenhouse gas emissions.  BLM estimated that the Rule would reduce emissions of methane by 175,000 to 180,000 tons per year (tpy), volatile organic compounds by 250,000 to 267,300 tpy, and hazardous air pollutants by 1,859 to 2,031 tpy.

64.     In accordance with Executive Order 12,866, BLM prepared a regulatory impact analysis (RIA) that examined the costs and benefits of the Rule.  Overall, BLM concluded that the Waste Prevention Rule's benefits outweighed its costs "by a significant margin" with "net benefits ranging from $46 million to $199 million per year."  81 Fed. Reg. at 83,014.

65.     BLM also evaluated the cost of the Rule on small businesses.  It determined that the average annual compliance costs would range from about $44,600 to $65,800 for each company.  Based on the midpoint average of $55,200, BLM estimated that compliance costs would constitute approximately 0.15% of per company profits.  Based on this analysis, BLM concluded that the Rule was not expected to impact investment decisions or employment in the oil and gas industry.

66.     Part of BLM's net benefits calculation was based on the social cost of methane.  BLM relied upon an estimate of the social cost of methane that was published in peer-reviewed literature and approved for use by an inter-agency working group, made up of representatives of 12 agencies, including the Department of the Interior and the White House Office of Management and Budget.  This social cost of methane estimate was based on a closely related social cost estimate for carbon dioxide developed by the interagency working group in 2010, which has been subject to extensive public comment and peer review, including review by the National Academy of Sciences.  In the preamble to the Waste Prevention Rule, BLM discussed the limitations of the social cost of methane

metric, but nevertheless concluded that it represents the best available information about the social

benefits of methane reductions to be used in a cost-benefit analysis.

**II.      The New Presidential Administration Decides to Revise or Rescind the Rule and Unsuccessfully Attempts to Alleviate Compliance Obligations.**

67.     The Western Energy Alliance (WEA), other industry groups, and the states of North

Dakota, Wyoming, and Montana challenged the Waste Prevention Rule in the District of Wyoming.

The district court denied their request for a preliminary injunction, and the Waste Prevention Rule

went into effect on January 17, 2017.

68.     WEA, the American Petroleum Institute (API) and other industry groups, as well as

some states, also lobbied members of Congress to repeal the Rule using the Congressional Review

Act (CRA).

69.     While still a member of the U.S. House of Representatives, Secretary Zinke voted in

favor of repealing the Waste Prevention Rule through the CRA.  Once he became the Secretary of

the Interior, Secretary Zinke lobbied Congress to repeal the Rule.  When asked about the Waste

Prevention Rule by a reporter, Secretary Zinke characterized it as "duplicative and unnecessary."  He

later answered "yes" when asked by a Senate committee if he supported congressional efforts to

repeal the Rule through the CRA.

70.     However, a majority of Senators voted against the motion to proceed to debate on the

CRA resolution on May 10, 2017.  On May 11, 2017, the window for expedited consideration under

the CRA expired.

71.     Prior to the Senate vote, on March 28, 2017, President Trump issued Executive Order

No. 13,783, directing the Secretary of the Interior to consider revising or rescinding the Waste

Prevention Rule.  Exec. Order No. 13,783, Promoting Energy Independence and Economic Growth,

at § 7(b)(iv), 82 Fed. Reg. 16,093, 16,093 (Mar. 28, 2017).

72.     The next day, Secretary Zinke issued Secretarial Order No. 3349 directing the BLM

Director to review the Rule and report to the Assistant Secretary of Land and Minerals Management

within 21 days on whether the Rule is fully consistent with the policies set forth in Executive Order

1   No. 13,783.  Secretary of the Interior, Order No. 3349, American Energy Independence, at § 5(c)(ii)

2   (Mar. 29, 2017).

3        73.    On April 4, 2017, WEA sent a written request to Secretary Zinke, asking BLM to

4   suspend the Waste Prevention Rule during the ongoing administrative review of the Rule.

5        74.    On May 16, 2017, API also sent a letter requesting that BLM postpone the Rule's

6   compliance dates.

7        75.    BLM's Acting Director completed the 21-day report required by the Secretarial

8   Order.  A copy of that report has not been made public.  BLM has failed to release copies of the 21-

9   day report in response to multiple requests under the Freedom of Information Act submitted by the

10  Conservation and Tribal Citizen Groups.

11       76.    BLM then developed a "three-step plan" to propose to revise or rescind the Waste

12  Prevention Rule and prevent any costs associated with compliance with the Rule in the interim.

13       77.    BLM took the first step on June 15, 2017 when, without notice or an opportunity for

14  public comment, BLM issued a notice under 5 U.S.C. § 705 staying all sections of the Rule with

15  compliance dates one year or more after the Rule's effective date.  82 Fed. Reg. 27,430 (June 15,

16  2017).  BLM stayed the Rule in response to WEA's and API's claims that the Rule was too costly.

17  BLM also concluded a stay was necessary because of the uncertain future of the requirements due to

18  the administration's decision to reconsider the Rule.

19       78.    The Conservation and Tribal Citizen Groups, as well as the States of California and

20  New Mexico, filed suit against BLM's stay in the Northern District of California.  BLM moved to

21  transfer venue to the District of Wyoming.  This Court denied that motion, holding that the Northern

22  District of California had a significant interest in the litigation as a result of the millions of acres of

23  BLM-managed lands and minerals in the state.  Order Denying Defs.' Mot. to Transfer at 4, 7,

24  *California v. BLM*, Nos. 17-cv-3804-EDL (Sept. 7, 2017), ECF No. 73.  The Court also held that the

25  Conservation and Tribal Citizen groups have close ties to California sufficient to support venue.  *Id.*

26  at 4.

27       79.    This Court later granted the Conservation and Tribal Citizen Groups' and the states'

28  motions for summary judgment, declared that BLM's purported attempt to stay the Rule's

compliance dates violated the APA, vacated the stay, and ordered BLM to reinstate the Rule in its entirety. *California v. BLM*, Nos. 17-cv-3804-EDL & 17-cv-3885-EDL, 2017 WL 4416409, at *14 (Oct. 4, 2017).

80.     The Court explained that "[t]he retraction of a duly-promulgated regulation requires compliance with the APA's notice-and-comment procedures." *Id.* at *9.  It further explained that "the policy underlying the statutory requirement of notice-and-comment is equally applicable to the repeal of regulations as to their adoption." *Id.* at *10.

81.     The Court further held that BLM "entirely failed to consider the benefits of the Rule, such as decreased resource waste, air pollution, and enhanced public revenues." *Id.* at *11.  It reasoned that "[w]ithout considering both the costs and the benefits of postponement of the compliance dates, the Bureau's decision failed to take this 'important aspect' of the problem into account and was therefore arbitrary." *Id.*

82.     As a result of this Court's Order, the Waste Prevention Rule was in effect until BLM finalized the Amendment.

**III.    BLM Proposes and Finalizes the Amendment.**

83.     One day after the Court reinstated the Rule, BLM took the second step of its three-step plan, proposing a rule to amend most of the Rule's compliance deadlines by extending them for a year.  82 Fed. Reg. 46,458 (Oct. 5, 2017).  BLM proposed the one-year extension to allow sufficient time for the agency to further revise or rescind the Rule.

84.     After issuing the proposal, BLM publicly represented that it *would* modify the Rule's compliance dates.  BLM informed the Wyoming district court that it planned to finalize the Amendment by December 8, 2017 and that its final action would alleviate the Petitioners' concerns about compliance with the Rule.  BLM also informed the court that it was working on a second rulemaking to revise or rescind the Waste Prevention Rule, which would obviate the need to proceed with the merits.

85.     BLM solicited public comment on its proposal for just 30 days.  This was much shorter than the 74-day comment period on the Waste Prevention Rule.  BLM did not hold any public hearings, as it had when developing the Waste Prevention Rule.  Although BLM received

1  numerous requests to extend the public comment period and hold public hearings, BLM refused to

2  do so.

3         86.    The sum total of BLM's stakeholder outreach involved two letters and a follow-up

4  call to tribal governments.

5         87.    BLM received over 158,000 public comments on the Amendment, including

6  approximately 750 unique comments.  The Conservation and Tribal Citizen Groups submitted

7  extensive comments objecting to the Amendment.

8         88.    BLM finalized the Amendment on December 8, 2017.

9         89.    The Amendment will take effect on January 8, 2017.  Despite having stated in its

10  proposal that the Amendment is a major rule (and would therefore could not take effect until

11  February 8, 2017), in its final Rule BLM states that the Amendment is *not* a major rule.  BLM

12  provides no explanation for this change.

13         90.    The Amendment modifies the Waste Prevention Rule by suspending until January 17,

14  2019 the obligation to comply with requirements of the Rule that have been in place since January

15  17, 2017, such as the requirement to prepare a waste management plan prior to drilling.  The

16  Amendment also revises the Waste Prevention Rule by delaying for a year the provisions of the Rule

17  with compliance deadlines on or after January 18, 2017.  BLM states that the Amendment suspends

18  or delays all the requirements that "generate benefits of gas savings or reductions in methane

19  emissions."  82 Fed. Reg. at 58,051.

20         91.    BLM prepared an RIA for the Amendment.  The RIA estimates that the Amendment

21  will lead to decreased natural gas production of around 9.0 billion cubic feet during the year it is in

22  place.  This gas would have been captured and put to use under the Waste Prevention Rule.  BLM

23  estimates that the Amendment will lead to a corresponding reduction in royalties of $2.61 million.

24         92.    BLM projects additional emissions of 175,000 tons of methane and 250,000 tons of

25  volatile organic compounds during the year of the Amendment.  These methane emissions are the

26  climate equivalent of adding 3,000,000 passenger vehicles to the road during that time (at the 20-

27  year global warming potential).

28

Complaint for Declaratory and Injunctive Relief                   22

93.     BLM states that the Amendment is authorized under its authority to revise its existing regulations.  At the same time, BLM claims that the Amendment does not substantively change the Waste Prevention Rule.  BLM provides no explanation for how the Amendment is consistent with its statutory mandates under the MLA, FLPMA, or other statutes.

94.     The Waste Prevention Rule replaced BLM's existing waste prevention regulations found in NTL-4A.  The Amendment neither reinstates NTL-4A nor analyzes or provides any interim regulations or guidance to prevent waste.  But BLM's Amendment RIA erroneously assumes that the suspension will result in a return to NTL-4A and thereby underestimates the waste of natural gas, lost royalties and social harms that will occur under the Amendment.

95.     BLM points to other federal, tribal, and state regulations that limit waste.  In the Waste Prevention Rule, however, BLM determined that these existing regulations were not sufficient to adequately limit waste.  BLM offers no explanation for its change in position.  BLM also does not discuss the impact of EPA's similar proposal to suspend its regulations in anticipation of later revising or rescinding them.

96.     BLM states that the purpose of the Amendment is to avoid imposing compliance costs on operators for provisions that may be revised or rescinded in the future.  BLM also expresses its desire to avoid expending agency resources implementing the Rule.

97.     BLM concedes that the Amendment is a direct outgrowth of President Trump's direction in Executive Order 13,783 to consider whether it is appropriate to rescind or revise the Waste Prevention Rule.  BLM claims that its initial review of the Waste Prevention Rule found that "some provisions of the 2016 final rule add considerable regulatory burdens that unnecessarily encumber energy production, constrain economic growth and prevent job creation."  82 Fed. Reg. at 58,050.  BLM offers no evidence in support of this conclusion, which conflicts with its prior position that compliance costs are modest and unlikely to significantly affect even the smallest companies or affect employment in the industry.

98.     Although BLM did not identify any specific burdens to industry in the proposed rule, in the final Amendment BLM states, without support, that there is "newfound concern" that the Waste Prevention Rule's requirements would pose a burden to operators of marginal or low-

1   producing wells.  This conflicts with BLM's prior position that the Rule reasonably accounted for

2   marginal or low-producing wells.

3       99.     Nor does the agency explain how its conclusions regarding the burdens to industry

4   are consistent with its own findings in the Amendment RIA.  Indeed, BLM determines that the

5   Amendment will have no significant economic benefit for even the smallest companies.  The

6   Amendment RIA concludes that the average reduction in compliance costs associated with the

7   Amendment would be a small fraction of a percent (0.17%) of the profit margin for small

8   companies.  Based on this analysis, BLM concludes that a one-year suspension would not

9   substantially alter the investment or employment decisions of firms.

10      100.    BLM also fails to explain how its decision to amend the compliance deadlines is

11  consistent with its stated goal of not substantially burdening the industry, or its previous analysis

12  finding that several of the Waste Prevention Rule requirements would pay for themselves through

13  cost savings.  For example, in the Waste Prevention Rule RIA, BLM estimated that the pneumatic

14  controller requirement would pay for itself, imposing costs of about $2 million per year while

15  generating cost savings from product recovery of $3 to $4 million per year.  Likewise, BLM had

16  estimated that the liquids unloading provisions would impose costs of about $6 million per year and

17  would generate cost savings of $5 to $9 million per year. BLM did not explain in the Amendment

18  RIA why or how it changed its estimates of cost savings associated with the Waste Prevention Rule

19  from those in the Waste Prevention Rule RIA.  BLM acknowledged in the Amendment RIA that the

20  capture target requirements would entail no compliance costs during the year of the Compliance

21  Revision, yet proceeded to suspend those requirements anyway.

22      101.    In the Amendment RIA, BLM uses a new estimate of the social cost of methane that

23  diverges from the one approved by the interagency working group and used to evaluate the Waste

24  Prevention Rule.  The estimate used to evaluate the Waste Prevention Rule is based on peer-

25  reviewed literature and analyses that have undergone extensive public comment and external review.

26  The estimate used to evaluate the Amendment has undergone no such review.  Indeed, the

27  Amendment is the first time the federal government has relied on this estimate in a rulemaking.

28

BLM states that the new estimate is an "interim" value to be used until additional estimates can be developed.

102.    BLM made two "interim" changes to the federal government's prior standardized estimates of the social cost of methane.  First, BLM reduced the cost estimate to attempt to exclude all harms from climate change that occur outside of the United States.  The National Academies and the interagency working group have concluded that no good methodologies for excluding non-domestic harms exist.  Second, BLM reduced the apparent benefits of the Rule still further by discounting them at a much higher rate than in the Waste Prevention Rule.  This change is contrary to expert consensus and OMB guidance on discounting for policies with long-term, intergenerational benefits.

103.    The two "interim" changes that BLM made to the estimates of the social cost of methane eliminate 95% or 87% (depending on the discount rate used) of the estimated cost of the harm from climate change associated from one ton of methane as compared to the social cost of methane that BLM used in the Waste Prevention Rule.

104.    The RIA also assumes that the costs and benefits of the Rule will be shifted one year into the future.  But the purpose of the Amendment is to relieve operators from compliance obligations while BLM completes the process of revising or rescinding the Rule.  By assuming the Waste Prevention Rule will go into effect a year later when that is not BLM's plan, BLM underestimates the impacts of the Amendment.

105.    BLM's EA analyzed only two alternatives:  a no action alternative and the chosen alternative of suspending the Waste Prevention Rule.  BLM did not analyze other reasonable alternatives proposed by members of the public in their comments on the proposed rule.  For example, BLM did not analyze the alternative of suspending oil and gas leasing and permitting activities for the duration of the Amendment.

106.    BLM committed to its chosen alternative—suspending the Waste Prevention Rule— before completing the draft EA.  BLM committed to its chosen alternative before it reviewed public comments.

107.     BLM chose to complete an EA for the Amendment, rather than an Environmental Impact Statement (EIS).  It explained its decision in a Finding of No Significant Impact (FONSI).

108.     BLM recognizes that the impacts of the action are national in scope, but would primarily be felt in the West.  BLM states that the temporary nature of the Amendment mitigates against a finding of significance.  In the FONSI, BLM assumes that at the end of the year the Amendment is in place, the requirements of the Waste Prevention Rule will come back into effect. At the same time, BLM acknowledges in the FONSI that the purpose of the Amendment is to ensure operators do not have to comply with the Waste Prevention Rule while BLM considers revising or rescinding the Rule.  In the Amendment, BLM indicates that it chose to suspend compliance for one year because that would provide sufficient time for BLM to finalize its revision or rescission.

109.     The FONSI does not discuss the significant controversy associated with BLM's "interim" social cost of methane estimate or concerns raised in comments that it dramatically underestimates the harm from the Amendment.

110.     In the EA, BLM projects additional emissions of 175,000 tons of methane, 250,000 tons of volatile organic compounds, and 1,860 tons of hazardous air pollutants during the year of the Amendment.  Although the EA quantified these increased emissions, BLM did not analyze how those increased emissions would impact human health and the environment.  In the FONSI, BLM discounted the significance of these impacts by arguing that they would occur largely in sparsely populated areas.

111.     BLM has previously completed EISs for oil and gas development projects with much lower methane, volatile organic compound, and hazardous air pollutant emissions.  Despite the Amendment's significant air quality and climate impacts on public health, BLM did not complete an EIS.

112.     In the EA, BLM did not analyze how increased flaring will negatively impact people who live and/or recreate on or near lands managed by BLM.

113.     BLM did not analyze the environmental justice concerns that result from increased flaring and air pollution, including disproportionate impacts on tribal communities.

114.    In the EA, BLM acknowledges that EPA recently proposed to delay portions of new source performance standards for the oil and gas sector.  EPA is also considering whether to revise or rescind those standards.  BLM did not analyze the cumulative impacts of the Amendment and EPA's potential suspension, revision, or rescission of its new source performance standards for the oil and gas sector.

115.    BLM has yet to take the third step of its "three-step plan," proposing a rule to revise or rescind the Waste Prevention Rule.  But it has promised that it will use the period during which the Waste Prevention Rule's obligations are lifted in order to issue such a proposal.  The EA does not analyze the impacts of completely repealing or partially rescinding the Waste Prevention Rule. BLM also did not analyze the cumulative impacts of the Amendment and any potential future action to revise or rescind the Waste Prevention Rule.

## FIRST CLAIM FOR RELIEF

### (*Failure to Take Reasonable Precautions to Prevent Waste: Violation of the MLA and APA*)

116.    The allegations in paragraphs 1–115 are incorporated herein by reference.

117.    Under the MLA, BLM has a duty to ensure that oil and gas companies developing publicly-owned natural resources "use all reasonable precautions to prevent waste of oil or gas."  30 U.S.C. § 225.  Likewise, the MLA requires that each federal lease "shall contain provisions . . . for the prevention of undue waste."  *Id.* § 187.

118.    BLM adopted the Waste Prevention Rule to fulfill its legal mandates under the MLA. Consistent with its statutory duties, BLM determined that the Waste Prevention Rule's requirements constituted "reasonable precautions to prevent waste of oil or gas" and would "prevent undue waste."

119.    BLM's Amendment removes the obligation to implement these "reasonable precautions to prevent waste of oil or gas" for one year.  BLM has not explained how a one-year suspension of the Rule constitutes all reasonable precautions to prevent waste.

120.    The Amendment does not even reinstate NTL-4A, which BLM found was inadequate. Instead, BLM relies on other state or federal laws and regulations to fill the regulatory void created by BLM's Amendment.  However, BLM can neither delegate nor abdicate its distinct, independent

1   MLA obligations to prevent waste to states or other agencies.  Moreover, BLM does not analyze or

2   explain how those regulations are sufficient to meet its independent mandate.  In fact, BLM

3   previously determined that they were insufficient.

4       121.    BLM's suspension or delay of reasonable precautions to prevent waste and failure to

5   have any rules in place to prevent waste violates the MLA, 30 U.S.C. §§ 187, 225, and is not in

6   accordance with law in violation of the APA, 5 U.S.C. § 706(2)(A).  At a minimum, BLM's failure

7   to address its statutory mandate to prevent waste is arbitrary and capricious in violation of the APA.

8   5 U.S.C. § 706(2)(A).

9       122.    BLM's reliance on the existing laws and regulations of other state or federal agencies

10  as sufficient also represents an arbitrary and capricious change in position without adequate

11  explanation or support in the administrative record in violation of the APA.  5 U.S.C. § 706(2)(A).

12                          **SECOND CLAIM FOR RELIEF**

13              *(Arbitrary Revision of the Waste Prevention Rule:  Violation of the APA)*

14      123.    The allegations in paragraphs 1–115 are incorporated herein by reference.

15      124.    BLM's Amendment changes the compliance dates of a duly promulgated regulation

16  and therefore amounts to a substantive revision of the Waste Prevention Rule.  But BLM has not

17  gone through the proper procedure to make a substantive revision, including (1) demonstrating that

18  the new approach is permissible under the governing statutes, (2) showing there are "good reasons"

19  for changing the rule, and (3) offering a "reasoned explanation" for its changed position.  *FCC v.*

20  *Fox Television Stations, Inc.* 556 U.S. 502, 514–16 (2009).

21      125.    BLM fails to explain how the Amendment is consistent with its statutory duties to

22  prevent waste under the MLA, 30 U.S.C. §§ 187, 225, to protect the interests of the United States

23  and the public welfare under the MLA, *id.* § 187, and to manage the public lands "in a manner that

24  will protect the quality of the . . . scenic . . . environmental, [and] air and atmospheric . . . values"

25  and "prevent unnecessary or undue degradation" under FLPMA, 43 U.S.C. §§ 1701(a)(8), 1732(b).

26      126.    BLM fails to offer a reasoned explanation for its claim that the Rule's provisions "add

27  considerable regulatory burdens that unnecessarily encumber energy production, constrain economic

28  growth and prevent job creation," which conflicts with its prior conclusions and evidence in the

record.  Even accepting BLM's stated purpose for the Amendment, BLM fails to provide good reasons for suspending requirements that have no compliance costs during the year of the Amendment or pay for themselves, or explain its changed positions with respect to these issues.

127.    BLM also fails to offer good reasons for relying on a new "interim" estimate of the social cost of methane that relies on methodologies that are unsupported in the record and contrary to expert consensus.

128.    In adopting the Amendment, BLM omits consideration of relevant factors and data, relies on factors which Congress did not intend the agency to consider, and offers rationales that are unsupported or run counter to the evidence in the administrative record, lack a rational basis, represent unexplained and unsupported changes in position, and are otherwise arbitrary and capricious in violation of the APA.  5 U.S.C. § 706(2)(A).

### THIRD CLAIM FOR RELIEF

### (*Ultra Vires Action: Exceeding Authority of MLA and APA*)

129.    The allegations in paragraphs 1–115 are incorporated herein by reference.

130.    To the extent that BLM claims it has authority to suspend compliance with a final rule while it considers further changes to the rule, neither the MLA, the APA, nor any other statutory provision provide BLM with such authority.

131.    BLM also does not have inherent authority to suspend compliance with a final rule while it considers changes to the rule.

132.    BLM's attempt to suspend compliance with the Waste Prevention Rule while it considers revising or rescinding it exceeds its statutory authority in violation of the APA.  5 U.S.C. § 706(2)(A), (C).

### FOURTH CLAIM FOR RELIEF

### (*Failure to Provide for Meaningful Public Comment:  Violation of the APA*)

133.    The allegations in paragraphs 1–115 are incorporated herein by reference.

134.    The APA requires agencies to engage in a public, notice-and-comment rulemaking process prior to adopting, amending, or repealing a regulation.  5 U.S.C. § 553.  This process is designed to "give interested persons an opportunity to participate in the rule making through

1  submission of written data, views, or arguments." *Id.* § 553(c).  The purpose of § 553 is to allow for

2  meaningful public comment.

3      135.  By inappropriately treating the Rule as a non-substantive revision, BLM failed to put

4  forward any analysis of why the Rule is permissible under the MLA or other statutory authorities, or

5  the factual basis supporting the revisions to specific provisions.  BLM's failure to do so precluded

6  meaningful comment on BLM's proposal, including the substantive legal and factual reasons to

7  retain the existing compliance deadlines.

8      136.  In its response to comments, BLM further deemed any comments about the merits of

9  the Waste Prevention Rule or its requirements "beyond the scope of this rulemaking," disregarding

10  comments that were directly relevant to its substantive revision of the Rule.

11      137.  BLM failed to keep an open mind during the notice and comment process and instead

12  committed to revising the compliance deadlines in the Rule before taking public comment, rendering

13  the public comment period meaningless.  Indeed, BLM failed to make any significant changes to the

14  final rule in response to public comments.

15      138.  BLM's rushed process also precluded meaningful public comment.  For example,

16  BLM failed to provide adequate time to comment on its proposal, did not provide for any public

17  hearing, and the extent of its consultation with tribes was two letters informing the tribes of this

18  action.  This was all despite the fact that BLM's proposal constituted a significant reversal of its

19  prior positions.  For example, BLM fundamentally changed the way it evaluates and monetizes the

20  harm caused by methane emissions by relying on a novel and unsupported "interim" social cost of

21  methane rather than the peer-reviewed social cost of methane developed through multi-year inter-

22  agency effort.  BLM's rush to get the final Amendment out the door also led to perfunctory—rather

23  than searching or careful—consideration of public comments.

24      139.  BLM's decision to suspend or delay provision of the Waste Prevention Rule without

25  providing a meaningful opportunity for public comment violates § 553 and is arbitrary and

26  capricious, an abuse of discretion, not in accordance with law, and without observance of procedure

27  required by law in violation of the APA.  5 U.S.C. § 706(2)(A), (D).

28

# FIFTH CLAIM FOR RELIEF

### *(Violation of NEPA)*

140.    The allegations in paragraphs 1–115 are incorporated herein by reference.

141.    NEPA requires agencies to take a "hard look" at the environmental impacts of proposed actions *before* the agency makes a decision or takes action to implement it.  42 U.S.C. § 4332; 40 C.F.R. §§ 1500.1, 1508.9.  Agencies must consider the direct, indirect, and cumulative impacts of their actions.  *Id.* §§ 1502.15, 1508.7, 1508.8, 1508.25(c).

142.    NEPA requires federal agencies to analyze "alternatives to the proposed action."  42 U.S.C. § 4332(2)(C)(iii); *see also id.* § 4332(2)(E).  Agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives."  40 C.F.R. § 1502.16.

143.    NEPA requires federal agencies to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the environment."  *Id.* § 4332(2)(C); 40 C.F.R. § 1501.4.  To determine whether an action has significant environmental impacts, an agency must consider, among other factors, "[t]he degree to which the proposed action affects public health or safety," "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," and "whether the action is related to other actions with individually insignificant but cumulative significant impacts."  40 C.F.R. § 1508.27. These factors must be assessed relative to both their "context" and "intensity." *Id.* § 1508.27(a), (b).

144.    An agency's environmental analysis must be based on "high quality" information, "[a]ccurate scientific analysis," and "expert agency comments."  40 C.F.R. § 1500.1(b).  "Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements."  40 C.F.R. § 1502.24.

145.    An agency may only forgo preparation of an EIS and rely on an Environmental Assessment (EA) if it issues a Finding of No Significant Impact (FONSI) that supplies a convincing statement of reasons explaining why a proposed action's impacts are insignificant.

146.    BLM failed to consider a reasonable range of alternatives, including the alternative of suspending or deferring oil and gas leasing and permitting for the duration of the Amendment as a mechanism to prevent waste.  BLM failed to provide any explanation for rejecting this alternative.

147.    BLM failed to take a hard look at the direct, indirect, and cumulative impacts of the Amendment, including the negative impacts of increased air pollution on public health, the negative impacts of increased flaring, and the climate impacts of increasing methane emissions.  BLM also failed to take a look at the disproportionate impacts of such impacts on tribal communities.

148.    BLM's reliance on the "interim" social cost of methane lacks professional and scientific integrity, is not based on high quality information, ignores information from expert agencies, and underscores the significance, in particular the highly controversial nature, of its proposed action.

149.    BLM failed to prepare an EIS despite the context and intensity of its proposed action and despite the extensive negative public health impacts, the high degree of controversy, and the cumulative impacts of the Amendment render it a "significant" action.  Accordingly, BLM failed to provide a convincing statement of reasons justifying its decision to forgo preparation of an EIS.

150.    For these reasons, BLM's decision to finalize the Amendment violates NEPA and is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law.  5 U.S.C. § 706(2)(A), (D).

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court:

1.    Issue a declaratory judgment that BLM violated the MLA FLPMA, NEPA, and acted arbitrarily, capriciously, contrary to law, and in excess of statutory authority, and failed to follow the procedure required by the APA by suspending and delaying the Waste Prevention Rule's compliance dates;

2.    Vacate the Amendment and reinstate the Waste Prevention Rule in its entirety;

3.    Award the Conservation and Tribal Citizen Groups their costs, expenses, and reasonable attorney fees; and

4.    Provide such other relief as the Court deems just and proper.

1    Respectfully submitted this 19th day of December, 2017,

2

3                     /s/ Stacey Geis
                      Stacey Geis, CA Bar # 181444
4                     Earthjustice
                      50 California St., Suite 500,
5                     San Francisco, CA  94111-4608
                      Phone: (415) 217-2000
6                     Fax: (415) 217-2040
                      sgeis@earthjustice.org
7

8
                      Robin Cooley, CO Bar # 31168 (*pro hac vice pending*)
9                     Joel Minor, CO Bar # 47822 (*pro hac vice pending*)
                      Earthjustice
10                    633 17ᵗʰ Street, Suite 1600
                      Denver, CO 80202
11                    Phone: (303) 623-9466
                      rcooley@earthjustice.org
12                    jminor@earthjustice.org

13
                      *Attorneys for Plaintiffs Sierra Club, Fort Berthold Protectors of Water and*
14                    *Earth Rights, Natural Resources Defense Council, The Wilderness Society,*
                      *and Western Organization of Resource Councils*
15

16                    Susannah L. Weaver, DC Bar # 1023021 (*pro hac vice pending*)
                      Donahue & Goldberg, LLP
17                    1111 14th Street, NW, Suite 510A
                      Washington, DC 20005
18                    Phone: (202) 569-3818
                      susannah@donahuegoldberg.com
19

20                    Peter Zalzal, CO Bar # 42164 (*pro hac vice pending*)
                      Rosalie Winn, CA Bar # 305616
21                    Samantha Caravello, CO Bar # 48793 (*pro hac vice pending*)
                      Environmental Defense Fund
22                    2060 Broadway, Suite 300
                      Boulder, CO  80302
23                    Phone: (303) 447-7214 (Mr. Zalzal)
                      Phone: (303) 447-7212 (Ms. Winn)
24                    Phone: (303) 447-7221 (Ms. Caravello)
                      pzalzal@edf.org
25                    rwinn@edf.org
                      scaravello@edf.org
26

27

28

Complaint for Declaratory and Injunctive Relief                                          33

Tomás Carbonell, DC Bar # 989797 (*pro hac vice pending*)
Environmental Defense Fund
1875 Connecticut Avenue, 6th Floor
Washington, D.C.  20009
Phone: (202) 572-3610
tcarbonell@edf.org

*Attorneys for Plaintiff Environmental Defense Fund*

Laura King, MT Bar # 13574 (*pro hac vice pending*)
Shiloh Hernandez, MT Bar # 9970 (*pro hac vice pending*)
Western Environmental Law Center
103 Reeder's Alley
Helena, MT 59601
Phone: (406) 204-4852 (Ms. King)
Phone: (406) 204-4861 (Mr. Hernandez)
king@westernlaw.org
hernandez@westernlaw.org

Erik Schlenker-Goodrich, NM Bar # 17875 (*pro hac vice pending*)
Western Environmental Law Center
208 Paseo del Pueblo Sur, #602
Taos, NM 87571
Phone: (575) 613-4197
eriksg@westernlaw.org

*Attorneys for Plaintiffs Center for Biological Diversity, Citizens for a Healthy Community, Diné Citizens Against Ruining Our Environment, Earthworks, Montana Environmental Information Center, National Wildlife Federation, San Juan Citizens Alliance, WildEarth Guardians, Wilderness Workshop, and Wyoming Outdoor Council*

Darin Schroeder, KY Bar # 93828 (*pro hac vice pending*)
Ann Brewster Weeks, MA Bar # 567998 (*pro hac vice pending*)
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
Phone: (617) 624-0234
dschroeder@catf.us
aweeks@catf.us

*Attorneys for Plaintiff National Wildlife Federation*

Scott Strand, MN Bar # 0147151 (*pro hac vice pending*)
Environmental Law & Policy Center
15 South Fifth Street, Suite 500
Minneapolis, MN 55402
Phone: (312) 673-6500
Sstrand@elpc.org

Rachel Granneman, IL Bar # 6312936 (*pro hac vice pending*)
Environmental Law & Policy Center
35 E. Wacker Drive, Suite 1600
Chicago, IL 60601
Phone: (312) 673-6500
rgranneman@elpc.org

*Attorneys for Plaintiff Environmental Law & Policy Center*

Meleah Geertsma, IL Bar # 233997 (*pro hac vice pending*)
Natural Resources Defense Council
2 N. Wacker Drive, Suite 1600
Chicago, IL 60606
Phone: (312) 651-7904
mgeertsma@nrdc.org

*Attorney for Plaintiff Natural Resources Defense Council*